# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| JAMES MIGLIORISI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   No. 06 C 3290 |
| | ) |
| THE WALGREENS DISABILITY | )   Judge Rebecca R. Pallmeyer |
| BENEFITS PLAN, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff James Migliorisi, a former staff pharmacist at Walgreens Co. ("Walgreens"), is suing The Walgreens Disability Benefits Plan ("the Plan"), seeking to recover long-term disability benefits pursuant to ERISA section 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B). Miglioirisi claims that Paul Revere Life Insurance Company ("Paul Revere"), which administers the Plan, improperly denied his application for long-term benefits in 2001, and improperly upheld this decision in a 2005 reassessment. The parties have stipulated to a Rule 52(a) "trial on the papers," in which the court reviews the stipulated record, resolves any disputes of fact, and determines the outcome of the case. *See, e.g.*, *Marshall v. Blue Cross Blue Shield Ass'n*, No. 04 C 6395, 2006 WL 2661039, at *1-2 (N.D. Ill. Sept. 13, 2006) (concluding that a Rule 52 trial on the papers is an appropriate procedure for resolving ERISA benefits disputes, absent objections from the parties). Accordingly, the court's findings of fact and conclusions of law are enumerated below.[1]

---

[1] To the extent that any findings of fact are more appropriately characterized as conclusions of law, or vice versa, they should be so construed. *See, e.g., Quela v. Payco-General Am. Creditas, Inc.*, No. 99 C 1904, 2000 WL 656681, at *1 (N.D. Ill. May 18, 2000).

**FINDINGS OF FACT**

**Employment at Walgreens**

1.      Migliorisi, who has a Bachelor of Science degree in pharmacy, was employed as a staff pharmacist for Walgreens until February 18, 1999.   (Pl.'s Resp. to Def.'s Proposed Findings of Fact [Pl.'s Resp. to PFF] ¶¶ 3, 6.)

2.      As a staff pharmacist, Migliorisi was covered by Walgreens Group Policy No. G-28569 ("the Policy,") with the Paul Revere Life Insurance Co.  (Pl.'s Resp. to PFF ¶ 7.)

3.      A staff pharmacist at Walgreens is required to stand continuously during an eight-hour work shift, and frequently to lift and carry objects weighing as much as twenty pounds.  (Pl.'s Resp. to PFF ¶ 5.)

**Migliorisi's Medical History**

4.      Migliorisi contends in this lawsuit that his employment ended due to ulcerative colitis and pain arising from spondyloarthropathy, although the Plan disputes this.  (Pl.'s Proposed Finding of Fact [Pl.'s PFF] ¶ 3; Def.'s Resp. to Pl.'s Proposed Findings of Fact [Def.'s Resp. to PFF] ¶ 3.)

5.      "Ulcerative colitis is a chronic inflammatory and ulcerative disease arising in the colonic mucosa, characterized most often by bloody diarrhea."  Mark K. Beers et al., *The Merck Manual of Diagnosis and Therapy* 155 (18th ed. 2006).

6.      "Spondyloarthropathy" is an initial diagnosis used when a patient has a group of common symptoms associated with the chronic diseases in the spondylitis family but does not meet the criteria for diagnosis of any specific disease.  Spondylitis Assoc. of Am., Undifferentiated Spondyloarthropathy, at "About," http://www.spondylitis.org/about/undif.aspx (last visited Mar. 19, 2008).  Those symptoms can include one or more of the following:  (1) inflammatory back pain, (2) unilateral or alternating buttock pain, (3) inflamation at the junction between bones and tendons or ligaments, (4) peripheral arthritis, (5) arthritis of the small joints, (6) swollen fingers or toes, (7) heel pain, (8) fatigue, and (9) inflammation of the iris.  *Id.* at "Symptoms."  "Spondylitis" is a name given

to a group of chronic diseases involving inflammatory arthritis that primarily affect the spine, but may affect other areas as well. *Id.* at "Frequently Asked Questions," http://www.spondylitis.org/about/faq.aspx. When caused by a bowel disease such as ulceratitive colitis, spondylitis would be diagnosed as "Enteropathic Arthritis." *Id.*

7.      Migliorisi was first diagnosed as having ulceratitive colitis in 1989 by an unidentified physician. (Pl.'s Resp. to PFF ¶ 22.) In March 1999, Migliorisi was referred by his internist, Dr. Cameron Thomson, to see Dr. Thomas Palella, a rheumatologist, for examination of his spondyloarthropathy. (Pl.'s Resp. to PFF ¶ 27.) Dr. Palella, in a review of Migliorisi's medical history, noted that Migliorisi's colitis was currently under "excellent clinical control." (Admin. R. [AR] at 0382.) Dr. Palella noted, further, that since 1993, Migliorisi had experienced "mild and periodic flares of his GI disease (apparently every two months)" and that "his bowel disease has apparently been under fairly good control" since 1993. (AR at 0381.)

8.      Dr. Stephen Hanauer, a gastroenterologist, has treated Migliorisi's colitis since 1990. (AR at 0483.) He examined Migliorisi in December 1995, January 1997, March 1997, and July 1999, and noted on those dates that Migliorisi's bowel disease was "quiescent," with "post-inflammatory changes." (Pl.'s Resp. to PFF ¶ 23.) As of March 1997, Dr. Hanauer was "pleased to report" that biopsies of Migliorisi's colon "revealed no worrisome changes," providing "only evidence of inactive colitis," with "extensive scarring of the colon and numerous post-inflammatory polyps." (AR at 0558.)

9.      By that September, however, Migliorisi complained to his internist, Dr. Thompson, that he was "unable to go to work half the time." He complained of a "messy divorce and break-up [with his] girlfriend" and stated that his "life [was] collapsing." Migliorisi told Dr. Thompson that he was seeing a psychiatrist and taking Prozac twice daily. (Pl's Resp. to PFF ¶ 24.) He also complained of fatigue and an increased need for sleep, as well as persistent back and leg pain, which he claimed was related to standing at work, and could be relieved by rest. (AR at 0140; Pl.'s

Resp. to PFF ¶ 25.)  Dr. Thomson's notes do not make clear whether Migliorisi's inability to go to work stemmed from his colitis, from his back and leg pain, or from his psychiatric problems.  (AR at 0114.)

10.     Dr. Thompson diagnosed Migliorisi as suffering from (1) ulcerative colitis, (2) fatigue, weakness, and an elevated need for sleep, "consistent with depression", and (3) spondyloarthropathy in his back.  (AR 0140.)

11.     Dr. Thompson next examined Migliorisi in June 1998; he repeated his prior diagnoses, and noted that the fatigue was the "same or worse."  (Pl.'s Resp. to PFF ¶ 26.)

**The Policy**

12.     Under the Policy, an employee is entitled to benefits for a 24-month period if he has become totally disabled from work in his "own occupation."  These benefits were self-funded by Walgreens, and not part of Paul Revere's coverage.  (Mot. for J. at 2; Policy at SB, 8.)  After 24 months, the employee may recover benefits only if he is disabled from working in "any occupation." (Policy at SB, 11, 13.)

13.     Migliorisi challenges the denial of his application for long term benefits under the Policy's  long-term disability coverage, which provides benefits for employees who have become "totally disabled from any occupation."  (Pl.'s Resp. to PFF ¶¶ 1-2, 11.)  The Policy defines "any occupation" disability as follows:

> Totally disabled from any occupation . . . means:
>
> 1.     because of injury or sickness, the employee is completely prevented, [sic] from engaging in any occupation for which he is or may become suited by education, training or experience; and
>
> 2.     the employee is receiving doctor's care.  We will waive this requirement if we receive written proof acceptable to us that further doctor's care would be of no benefit to the employee.

(Policy at 8.)

 **Migliorisi's "Own Occupation" Disability Claim Application**

14.     On or about March 1, 1999, Migliorisi submitted an Employee Claim Application to Walgreens, signed by Dr. Thompson.  (Pl.'s Resp. to PFF ¶ 12.)  Thompson identified Migliorisi's conditions as ulcerative colitis, spondyloarthropathy, and myalgia; he stated that Migliorisi had been continuously and totally disabled from "2/20" through "now." (AR at 0154.)

15.     At some point (the date is not clear from the record), Walgreens denied Migliorisi's application for "own occupation" disability benefits.  The letter of determination was not included in the administrative record, however, and neither of the parties have provided the court with a copy of it.  (*See* Pl.'s Resp. to PFF ¶ 15.)

16.     On September 15, 2000, Migliorisi's attorney sent a letter to Walgreens seeking review and reconsideration of its decision that Migliorisi was not entitled to "own occupation" disability benefits.  (AR at 0491.)  Walgreens did reverse its prior determination and decided on December 13, 2000, that  Migliorisi was entitled to "own occupation" disability benefits for his first two years of disability.  (AR at 0500.)  Walgreens paid Migliorisi benefits for the period from February 19, 1999 through February 20, 2001.  (Def.'s Resp. to PFF ¶ 9.)

**"Any Occupation" Disability Benefit Application**

17.     In December 2000, Migliorisi received notice that Paul Revere would be responsible for determining his eligibility for long-term disability benefits under the "any occupation" disability standard.  (Pl.'s Resp. to PFF ¶ 18.)

18.     On January 15, 2001, Migliorisi submitted a supplemental statement in connection with Paul Revere's review, in which he stated that the only changes since his last report were decreased mobility, chronic fatigue, and decreased concentration due to his medications.  (AR at 0522.)  The supplemental statement did not make clear what his "last report" was, or when it was filed, however.

19.     Paul Revere denied Migliorisi's "any occupation" disability claim on March 27, 2001, and upheld this decision on two successive appeals in September 2001 and February 2002.  (Pl.'s

Resp. to PFF ¶¶ 20-21.)

**Migliorisi's Ulcerative Colitis**

20.     As discussed above, Migliorisi's ulcerative colitis was "quiescent" from 1995 through 1999; Dr. Hanauer described it as "inactive" in 1997 and as "well controlled" in 1999. (Pl.'s Resp. to PFF ¶ 23.)  In his March 29, 1999 summary of Migliorisi's medical history, made after Dr. Thomson's referral of Migliorisi, Dr. Palella (as noted, a rheumatologist) observed that Migliorisi's bowel disease "has apparently been under fairly good control" since 1993. (Pl.'s Resp. to PFF ¶ 31.)  Migliorisi nevertheless contends that Dr. Palella's March 29, 1999 notes show that he was suffering from both constipation and diarrhea "constantly." (Pf.'s PFF ¶ 83.) In fact, however, Dr. Palella did not note any complaints of frequent diarrhea and, in a typewritten case summary prepared the same day, Dr. Palella characterized Migliorisi's colitis as under "excellent clinical control." (Pl.'s Resp. to PFF ¶ 32; AR at 0048.)

21.     In an April 15, 1999 letter, Dr. Palella informed Dr. Hanauer of some of Migliorisi's test results related to his spondyloarthropathy, and noted his intention to take Migliorisi off of Lipitor, a statin-type medication that Migliorisi was taking at the time. (AR at 0385.) In the letter, Dr. Palella stated that "Mr. Migliorisi is understandably reluctant to take any medication which might upset the remission of his colitis," and noted that the colitis was "virtually asymptomatic." (*Id.*) On May 27, 1999, in handwritten notes that appear to document a check-up visit with Migliorisi, Dr. Palella noted that Migliorisi experienced flare-ups of his colitis that were "mild" and "brief." (AR at 0230.)

22.     On June 25, 1999, Registered Nurse Judy Swain, a consultant for Paul Revere, met with Migliorisi at his home in order to conduct an interview for the purpose of gathering current medical information regarding his disability. (AR at 0196; Def.'s PFF ¶ 14.)  This interview was in connection with Migliorisi's monthly indemnity policy through Equitable Life, which was being adjudicated by Paul Revere; this was a separate policy from either the "own occupation" policy administered by Walgreens, or the "any occupation" policy administered by Paul Revere. (Def.'s

Resp. to PFF ¶ 18; AR at 0190.) According to Swain, Migliorisi told her that his chronic ulcerative colitis was under control. (AR at 0196.) Swain did not report any complaints by Migliorisi regarding chronic diarrhea. (AR at 1096-0193.)

23.     On August 26, 1999, Dr. Palella signed a statement in connection with Migliorisi's "own occupation" benefit application, in which he identified Migliorisi's subjective symptoms as back and joint pain, swelling, stiffness, and fatigue. (AR at 0450.) Palella did not list diarrhea as among Migliorisi's subjective symptoms, or mention any GI difficulties, however. (Pl.'s Resp. to PFF ¶¶ 41-43; AR at 0450.)

24.     On January 17, 2000, Dr. Robert Katz sent a letter summarizing Migliorisi's medical history and limitations in connection with his independent review of Migliorisi's disability claim. (Pl.'s Resp. to PFF ¶ 50.) In this letter, he described Migliorisi as limited by spondyloarthropathy. (AR 0344-43.) He also stated that Migliorisi suffered from "mild GI symptoms," but he did not include a need to make frequent trips to the bathroom among Migliorisi's limitations. (*Id.*)

25.     On November 17, 2000, Migliorisi had an elective outpatient colonoscopy. On a medical history form, an unknown person noted that Migliorisi had complained of both constipation and diarrhea, with the duration of such episodes varying "depend[ing] on what he eats." (AR at 0583.) This notation was in a section asking whether the patient had "ever" experienced certain symptoms, so it is unclear *when* Migliorisi experienced these symptoms. (*Id.*) There is no information regarding the severity of these episodes, or the degree to which they limited Migliorisi's activities. (*Id.*)

26.     Dr. Hanauer performed the colonoscopy, and noted the presence of post-inflammatory polyps. (AR at 0585.) These polyps were biopsied, and Dr. Hanauer concluded that (1) there were no worrisome changes and that (2) Migliorisi's colitis was "inactive." (AR at 0588.) Dr. Hanauer suggested a follow-up appointment in six months for further monitoring. (*Id.*)

27.     In January of 2001, Dr. Palella completed an updated statement in connection with

Migliorisi's "any occupation" disability application. Again, this statement made no reference to any problems Migliorisi was experiencing due to chronic diarrhea. (AR at 0521.)

28. On October 11, 2001, Dr. Palella sent a letter to Migliorisi's attorney, James Provenzano, discussing the ways in which Paul Revere's denial of benefits could be challenged. The letter did not include any discussion of chronic diarrhea as one of Migliorisi's symptoms. (AR at 0665-64.)

29. On October 16, 2001, Migliorisi testified at a hearing before the Social Security Administration in connection with his successful application for Social Security disability benefits. (Claim Reassessment Unit File [hereinafter, CRUF], at 32.) No transcript of Migliorisi's testimony during the hearing has been provided, but the Administrative Law Judge's October 25, 2001 decision discusses Migliorisi's testimony, noting that he claimed to have "recurrent flare-ups of colitis, once or twice a week, despite good control with medication." (CRUF at 31.) Migliorisi also claimed, during the hearing, that his flare-ups lasted one to two days, on average, and that they kept him confined to the bathroom for five to thirty minutes at a time, eight to ten times per day. (CRUF at 29.)

30. The ALJ also adverted to unidentified "treatment notes" that reflected "ongoing complaints of occasional cramping and diarrhea" and to a July 1999 study showing "active inflammatory disease." (CRUF at 30.) The only July 1999 study in the record, however, is a colonoscopy and polyp biopsy performed by Dr. Hanauer, on the basis of which Dr. Hanauer described Migliorisi's colitis as "quiescent." (AR at 0568, 0566.)

31. In this record, Migliorisi's testimony before the ALJ was the only occasion on which Migliorisi claimed to have such severe and frequent diarrhea. That testimony is sharply inconsistent with medical evidence that his colitis was quiescent and "virtually asymptomatic", as Dr. Palella had previously described it. (AR at 0385.) Migliorisi did not include chronic diarrhea among his complaints to Drs. Hanauer or Palella, or among the limitations he described to Nurse Swain.

8

32.     Viewing the record as a whole, the court concludes that Migliorisi has not shown by a preponderance of the evidence that, as of February 2001, ulcerative colitis caused him to suffer from chronic diarrhea so severe as to significantly limit his ability to work.

**Migliorisi's Spondyloarthropathy and Associated Joint and Back Pain: Objective Evidence**

33.     Migliorisi also claims that he is disabled by spondyloarthropathy.  In assessing this claim, the court begins by reviewing medical findings, unrelated to his own testimony regarding pain or fatigue.

34.     On March 29, 1999, Dr. Palella set forth his interpretations of X-ray images of Migliorisi's hips, spine, shoulders, hands, and heels.  (Def.'s Resp. to PFF ¶ 62; AR at 0241.) Reviewing the X ray of Migliorisi's right hip, Dr. Palella noted that there were "no erosive or degenerative changes," and that there was "some irregularity of the symphysis pubis with sclerosis but no erosion."[2]  (Def.'s Resp. to PFF ¶ 62; AR at 0241.)  Dr. Palella noted that Migliorisi's right and left sacroiliac joints were "normal"[3] and that his "[l]umbar spine showed spur formation with horizontal takeoff at the superior margins of L4 and between T11 and T12 where there is early bridging."  (Def.'s Resp. to PFF ¶ 62; AR at 0241.)  He also noted a "minor degree of sclerosis." (Def.'s Resp. to PFF ¶ 62; AR at 0241.)  Migliorisi's right shoulder X rays were "normal."  (Def.'s Resp. to PFF ¶ 62; AR at 0241.)  Overall, the X rays reviewed by Dr. Palella in March 1999 "were essentially normal, with no evidence of bone erosion, new bone formation or any sign of joint damage."  (Pl.'s Resp. to PFF ¶ 35.)

35.     An MRI of Migliorisi's lumbar spine, taken in July 14, 1999, was also "normal."  (Pl.'s

---

[2]     The symphysis pubis is "the joint formed by the union of the bodies of the pubic bones in the median plane by a thick mass of fibrocartilage."  *Dorland's Illustrated Medical Dictionary* 1620 (28th ed. 1994).

[3]     The sacroiliac joint connects the sacrum (a triangular bone just below the lumbar vertebrae at the bottom of the spine) and the ilium (a part of the pelvis).  *Dorland's*, *supra*, at 819, 1479.

Resp. to PFF ¶ 35.)

36.     On August 29, 1999, Dr. Palella completed a form in connection with the "own occupation" disability benefit application.  At this time, he noted "back and joint pain, swelling, stiffness, [and] fatigue" among Migliorisi's symptoms.  (AR at 0164.)

37.     On October 14, 1999, Dr. Nancy Beecher reviewed Migliorisi's benefit application. She noted that the X rays and MRIs to date of Migliorisi's joints "failed to show any significant pathology, only mild degenerative changes."  (Def.'s Resp. to PFF ¶ 14; AR at 0173.)

38.     Dr. Robert Katz conducted an independent examination of Migliorisi on January 17, 2000, in response to a request from Provident Life and Accident Insurance Company, which appears to have been responsible for adjudicating Migliorisi's "any occupation" benefits claim.  (Pl.'s Resp. to PFF ¶ 50; AR at 0496-95, 0344, 0257.)  He noted the presence of a thoracic kyphosis[4], as well as some effusion, or swelling, of the right knee.  (AR at 0344.)  An MRI showed "minimal changes" to the spine, and an X ray "looked essentially normal with no signs of advanced spondylitis."  (*Id.* at 0343.)  Dr. Katz concluded that, although a spondyloarthropathy "would match with ulcerative colitis, there are not radiographic signs and not [sic] obvious stigmata on physical exam."  (*Id.* at 0343.)

39.     Dr. Katz concluded that "[t]his pain is more difficult to understand," presumably referring to Migliorisi's complaints of pain at a level of nine out of ten.  (AR at 0343.)  He stated that "[w]hat appears to be disabling to Mr. Migliorisi is subjective pain and weakness and fatigue."  (*Id.*) He concluded that "with Mr. Migliorisi's subjective symptoms (though not objective findings) he

---

[4]     Thoracic kyphosis is a curving of the upper spine, causing a rounded back.  *See* Howard S. An., M.D., *Kyphosis: Description and Diagnosis*, SpineUniverse.com, Feb. 14, 2008, http://www.spineuniverse.com/displayarticle.php/article1437.html. Kyphosis is associated with one type of spondyloarthropathy, known as ankylosing spondylitis.  *See* Mark H. Beers et al., *The Merck Manual of Diagnosis and Therapy* 290-91 (18th ed. 2006).  Ankylosing spondylitis is typically detectable using laboratory tests or radiographic imaging.  *See id.*  No physician has diagnosed Migliorisi as suffering from ankylosing spondylitis.

appears to be disabled." (*Id.*)

40.     In a September 2000 letter to Migliorisi's attorney, Dr. Palella noted that Migliorisi's X rays "are essentially normal at the present time." (AR at 0369.) He cautioned, however, that this did not exclude a diagnosis of spondyloarthropathy, even though "many patients" would "show evidence of sacroiliac erosion." (*Id.*) He explained that his diagnosis of spondyloarthropathy was "strictly clinical," in that it was premised on his observations and examinations, the patient's history, and the normal course of that type of disease. (*Id.* at 0368.) He made no mention in this letter of any specific observations that would confirm Migliorisi's complaints of pain or fatigue. (*Id.*)

41.     In a May 2001 letter to Migliorisi's attorney, Dr. Palella stated that the fact that Migliorisi's "x-rays and other imaging studies are normal" did not necessarily mean that he did not suffer from seronegative spondyloarthopathy. (AR at 0693.) Dr. Palella noted that Migliorisi had been found to have elevated levels of CPK, a muscle enzyme. (*Id.*) An elevated CPK level was found in a "not insignificant percentage of patients" with seronegative spondyloarthropathies, according to Dr. Palella, so the elevated CPK levels are evidence in support of Migliorisi's claim. (*Id.*) Dr. Palella did not provide any more detail about the percentages involved, or the likelihood that a patient might have elevated CPK levels without also having spondyloarthropathy. (*Id.*)

42.     Several years earlier, in a letter thanking Dr. Cameron Thomson for referring Migliorisi for treatment in March 1999, Dr. Palella had stated that "elevations of CPK are occasionally encountered in patients with inflammatory bowel disease." (AR at 0485.) He also found it "unusual," however, that Migliorisi's "joint symptoms have progressed recently while his bowel disease has been clinically quiescent." (*Id.*) And, in an April 15, 1999 letter to Dr. Hanauer, Dr. Palella stated that Migliorisi had only a "mild elevation of CPK and aldolase."[5] (Pl.'s Resp. to

---

[5]     Aldolase is an enzyme that helps break down sugars into energy, which is commonly found in high amounts in muscle tissue. *See* Frank A. Greco, *Alodlase Test*, MedlinePlus Med. Encyc., Oct. 15, 2007, http://www.nlm.nih.gov/medlineplus/ency/article/003566.htm. Elevated
(continued...)

PFF ¶ 37.)

43.     In an August 2001 response to the comments in Dr. Palella's May 2001 letter to Migliorisi's attorney, Dr. Beecher noted that, although it is possible for spondyloarthropathy to be present despite the absence of any signs on X ray, the absence of X-ray findings would normally be associated with milder forms of the disease, which would tend to be less disabling than what Migliorisi was claiming.  (AR at 0638-37.)  At that point in time, Migliorisi claimed to be unable to perform any occupation due to his spondyloarthropathy.  (AR at 0522-21.)

44.     In the October 2001 Social Security Decision, the ALJ noted that Migliorisi's internist, Dr. Thomson, had reported that Migliorisi's back was "somewhat kyphotic," meaning that Migliorisi had a kyphosis on his spine.  (CRUF at 30.)

45.     The ALJ determined that Migliorisi's SSA benefit claim was supported by objective evidence of disability.  (CRUF at 31.)  The only support for this assertion, however, was evidence of Migliorisi's past struggles with ulceratl've colitis.  (*Id.*)  The ALJ did not identify any objective evidence that Migliorisi's colitis caused more than "mild flares" after 1992, and did not discuss the statements by numerous physicians labeling it as "quiescent." (*Id.*)  Other than the quiescent colitis and the kyphosis, the ALJ did not identify any objective support for Migliorisi's claimed spondyloarthropathy.  (*Id.*)

46.     The court concludes that the balance of the objective evidence weighs against Migliorisi's claim that he is totally disabled by spondyloarthopathy.  Although the evidence suggests that elevated CPK levels can be associated with spondyloarthropathy, there is no indication that mild elevations, such as those described by Dr. Palella, are a good indication that

---

[5](...continued)
levels of aldolase can be caused by polymyositis, a rare inflammatory disease that causes muscle weakness.  *See id.*; Steve Lee, *Polymyolitis—Adult*, MedlinePlus Med. Encyc., July 27, 2007, http://www.nlm.nih.gov/medlineplus/ency/article/000428.htm.  Migliorisi does not claim to suffer from myolitis, and no doctor has diagnosed him as suffering from it.

spondyloarthropathy is present, rather than being "occasionally encountered" in spondyloan-thropathy patients. The fact that Migliorisi's colitis had been under excellent control for many years, and the absence of any radiographic signs, weigh against any finding of a significantly-disabling spondyloarthropathy. Although the objective medical evidence in this case is equivocal, the court concludes that Migliorisi has failed to prove that he was suffering from anything more than a mild case of seronegative spondyloarthropathy.

**Migliorisi's Subjective Complaints of Pain, Fatigue, Weakness, and Cognitive Impairment**

47.     In light of the minimal objective medical evidence, Migliorisi's entitlement to benefits depends on the credibility of his reports of subjective pain, fatigue, weakness, and cognitive impairment.

48.     On September 24, 1997, Migliorisi's internist, Dr. Thomson, noted that Migliorisi complained of persistent back and leg pain, related to standing at work. (Pl.'s Resp. to PFF ¶ 25.)

49.     After resigning from Walgreens in February 1999, Migliorisi similarly characterized the demands of his work there as disabling; on March 1, 1999, Dr. Thomson noted, Migliorisi stated that he "repeatedly had to go on disability . . . because he could not tolerate standing." (Pl.'s Resp. to PFF ¶ 27.) The court is uncertain why Dr. Thomson used the word "repeatedly," as there is no evidence that Migliorisi had ever gone on disability before February 1999. Dr. Thomson noted that Migliorisi had good range of motion in his joints. (*Id.*)

50.     Dr. Thomson diagnosed Migliorisi with spondyloarthopathy, ulcerative colitis, depression, and fatigue. (Def.'s Resp. to PFF ¶ 61.)

51.     As of March 29, 1999, Dr. Palella reported that "[Migliorisi] has been unable to work for the past five weeks, related to both an increase in his pain and a change in working conditions where he has to stand in a relatively fixed position for extended periods of time. After two hours of such a position, he is in 'agony.'" (Pl.'s Resp. to PFF ¶ 31.) Dr. Palella noted that Migliorisi was complaining, at that time, of back, joint, and leg pain, as well as leg weakness. (Pl.'s Resp. to PFF

13

¶ 30.)  And, in a May 2007 report, Dr. Palella noted that Migliorisi claimed his fatigue was growing worse.  (AR at 0230.)

52.     The record includes the observation of other medical professionals, as well.  On June 25, 1999, Nurse Swain interviewed Migliorisi at his home.  (AR at 0196.)  She observed him "walking, sitting, and being able to move from sitting to standing positions without pain behaviors." (AR at 0196.)  She did not observe any pain behaviors or grimacing during her visit.  (*Id.* at 0194.)

53.     Ms. Swain reported that Migliorisi claimed his only significant daily activities were stretching exercises and two walking exercises per day, and that otherwise he rests at home watching television.  (AR at 0195.)  He stated that he walks "if I'm up for it," and that he often naps twice daily due to fatigue.  (*Id.* at 0194.)  He described "a constant dull ache in his back and both legs," claimed to have pain in his knees, ankles, feet, shoulders, and elbows, and claimed to be unable to stand "for more than one hour." (AR at 0193, 0195.)

54.     Dr. Kenneth Vatz, a neurologist, examined Migliorisi on June 29, 1999.  (Pl.'s Resp. to PFF ¶ 38.)  He noted that Migliorisi was able to "hop on either foot, climb up onto a chair using either leg, and sit from a supine position without using his arms to assist him."  (*Id.* ¶ 39.)

55.     On August 26, 1999, Dr. Palella submitted a statement on Migliorisi's behalf to Paul Revere, in which he claimed that Migliorisi's fatigue limited his endurance, and that he could not walk or stand for extended periods.  (Pl.'s Resp. to PFF ¶ 44.)  As there was little objective medical evidence of disability, the court concludes this claim was necessarily based on Migliorisi's subjective reports of his own fatigue and pain.

56.     Upon hearing from an unidentified source that Migliorisi was engaging in home renovation and had recently been skiing, Paul Revere arranged for video surveillance to determine his level of activity.  (Pl.'s Resp. to PFF ¶ 56.)  This surveillance was conducted in September 1999, February 2000, and April 2000.  (*Id.*)

57.     The video evidence for September 1, 1999 shows Migliorisi walking around his

neighborhood for approximately fifty minutes, and then driving his car for roughly two hours. (Pl.'s Resp. to PFF ¶ 57.)

58.     The video evidence for September 4, 1999 shows Migliorisi engaged in cleaning his garage over the course of four hours, performing the following physical tasks: (1) climbing a stepladder, (2) climbing a stack of plastic boxes and balancing on his toes, (3) bending over to pick up various items, (4) climbing into the back of an SUV on his hands and knees, and (5) carrying two sets of golf clubs, one in each hand. (Pl.'s Resp. to PFF ¶ 57.) Having reviewed the September 4, 1999 videotape, the court notes that Migliorisi did not stand in one place for a sustained length of time during the four-hour period but that, over the course of four hours of physical activity, Migliorisi did not appear to be in obvious pain, nor did he appear significantly fatigued. (Ex. D. to Pl.'s Mot. for J.)

59.     On October 21, 1999, Dr. Palella submitted a Functional Capacity Checklist on Migliorisi's behalf. (Pl.'s Resp. to PFF ¶ 44.) In that submission, Dr. Pallela stated that that Migliorisi could stand for less than two hours and sit for up to six hours with breaks every two hours. (*Id.* ¶ 45.) Contrary to the August 26, 1999 statement in which Dr. Palella stated that Migliorisi could not walk for extended periods, the October 21, 1999 Checklist reflects that Migliorisi could walk for up to six hours with breaks every two hours. (*Id.*)

60.     Dr. Palella also stated that Migliorisi could "occasionally" stoop, crouch, bend, operate power tools, and reach above his shoulders and below his knees. (Pl's Resp. to PFF ¶ 45.) He further stated that Migliorisi could "frequently" drive, use a keyboard, grasp, reach at the waist level and manipulate objects, and that he could write "constantly" throughout an eight-hour workday. (*Id.*)

61.     A physical therapist interviewed Migliorisi on September 30, 1999. (AR at 0453.) Migliorisi told the therapist that he was unable to run, that he could not walk for prolonged periods, and that he had difficulty bending over to put on his shoes and socks. (Def.'s Resp. to PFF ¶ 75.)

62. On January 17, 2000, Dr. Katz conducted an independent examination of Migliorisi. (Pl.'s Resp. to PFF ¶ 50.) Dr. Katz noted that Migliorisi reported "mild tenderness over his lower spine," "decreased flexion of his lumbosacral spine," "decreased extension of his cervical spine" and occasional leg numbness. (*Id.* ¶ 51.) He also noted that Migliorisi had a normal range of motions in his knees and hips and that his concentration was "fairly good." (*Id.*) In Dr. Katz's opinion, Migliorisi did not "appear to magnify his symptoms." (*Id.* ¶ 54.) He concluded that Migliorisi appeared to be disabled "based on his job requirements" and his "subjective symptoms," although Dr. Katz speculated that Migliorisi could go back to work if a sitting position or light duty assignment could be arranged. (*Id.*)

63. Dr. Katz repeated his opinion in a letter of May 2, 2000, stating that he would "like to see Migliorisi return to work" with "job modifications such as work breaks and activities that are not too strenuous." (Pl.'s Resp. to PFF ¶ 55.) In the letter, he noted that Migliorisi had reported his pain to be at a "9 on a scale of 0-10." (AR at 0345.) This was presumably a reference to Dr. Katz's earlier report that Migliorisi experienced pain that "increases to 9 on a scale of 0-10 when he stands for a long time." (AR at 0343.)

64. On September 25, 2000, Dr. Palella took another history from Migliorisi. (Def.'s Resp. to PFF ¶ 76.) At that time, Migliorisi told Dr. Palella that his pain was "the same," that his fatigue was worse, and that he had problems with bending, stooping, standing, and fine gross repetitive hand motions. (*Id.*)

65. In January 2001, Dr. Palella filed an updated statement regarding Migliorisi's limitations, in connection with his application for "any occupation" disability benefits. (Pl.'s Resp. to PFF ¶ 47.) Dr. Palella reported substantially more significant limitations than were reflected in his October 1999 statement. Thus, in January 2001, Dr. Palella noted that Migliorisi could not stand for more than thirty minutes, although his October 1999 statement had indicated that Migliorisi could stand for up to two hours. (*Id.*) As of January 2001, Dr. Palella stated that Migliorisi could not sit

for more than an hour without shifting positions; he had previously stated that Migliorisi would need a break from sitting every two hours. (*Id.*) He noted in January 2001 that Migliorisi could not climb, bend, or stoop, despite having previously said that Migliorisi could "occasionally" do these things. (*Id.*) Finally, he stated that Migliorisi could not lift more than ten pounds. (*Id.*)

66.     On January 15, 2001, Migliorisi indicated on his "any occupation" disability application that his condition had recently grown worse, and that he was experiencing decreased mobility and concentration, due in part to the effects of his medications. (AR at 0522.) He stated further that his condition limited him from caring for himself in the areas of "navigating stairs, showering, [and] tieing [sic] shoes," and that he had "very limited driving" ability due to his medication. (*Id.*)

67.     In a letter to Migliorisi's attorney on May 22, 2001, Dr. Palella explained that side effects from medications such as Migliorisi was taking "are not common," and that when a patient experiences such side effects, the medication would be adjusted. (AR at 0626.) He also stated that it would be difficult to adjust Migliorisi's medications due to his ulcerative colitis. (*Id.*) He did not, however, state that Migliorisi was actually experiencing such side effects, or comment on any significant change in Migliorisi's response to the medication from October 1999 to January 2001.

68.     The reported change in Migliorisi's symptoms coincided almost perfectly with Migliorisi's need to meet the more restrictive "any occupation" standard of disability. Dr. Palella did not identify any change in Migliorisi's medications or disease that would have brought about such a result.

69.     The court concludes that, if Migliorisi in fact suffered from spondyloarthropathy, it manifested itself primarily by difficulty standing for long periods of time. It appears that he remained able to work from a sitting position for sustained periods, and to stay on his feet for long periods as long as he did not stand still. This conclusion is consistent with the observations of Nurse Swain, Dr. Katz, and Dr. Vatz, with Migliorisi's earlier descriptions of his symptoms, and with the

17

surveillance footage.

**Migliorisi's Ability to Perform "Any Occupation"**

70.     As discussed above, Dr. Katz suggested that Migliorisi could work in his former job as a pharmacist if given lighter duty or a chair to sit in.  (Pl.'s Resp. to PFF ¶ 54.)

71.     Paul Revere consulted Tim Bird, a vocational rehabilitation consultant, for information regarding what jobs Migliorisi could perform if limited to the most restrictive of Dr. Palella's limitations, with no standing for more than thirty minutes.  (Pl.'s Resp. to PFF ¶¶ 47, 65; AR at 0605.)    Bird listed a number of jobs that Migliorisi could perform with those limitations: Migliorisi could work as a Utilization Review Coordinator, analyzing medical records, charts, and computer printouts to ensure effective utilization review.  (Pl.'s Resp. to PFF ¶ 66.)  He also opined that Migliorisi could direct volunteer services at a hospital, and that he could work as a cytotechnologist, a hospital admitting clerk, or a claims adjudicator, all of which are sedentary occupations.  (*Id.*)

72.     Migliorisi's only challenge to the accuracy of this report is to argue that the limitations it incorporates are inaccurate.  (Pl.'s Resp. to PFF ¶ 66.)  They are, however, the strictest limitations propounded by any physician in the record provided to the court.

73.     The court respectfully departs from the ALJ's findings.  That decision rested on Migliorisi's testimony that he suffered from chronic diarrhea (CRUF at 029), which the court has concluded was not credible.  Second, it incorporated the very restrictive limitations propounded by Dr. Palella in January of 2001 (CRUF at 030-29), which the court likewise declines to credit; the ALJ did not address or explain inconsistencies noted here.  Finally, there is no indication that the ALJ considered and rejected the alternative occupations suggested by Bird in his transferable skills review.

74.     The court concludes that, by failing to rebut Bird's conclusions that he could work in a number of alternative jobs, Migliorisi has failed to establish, by a preponderance of the

evidence, that he could not perform the jobs listed in Bird's report.

## CONCLUSIONS OF LAW

**I.     Standard of Review**

1.      This is an action for recovery of disability benefits under the Policy, brought pursuant to section 502(a)(1)(B) of ERISA, 29 U.S.C. § 1132(a)(1)(B). (Compl. ¶ 4.) This court has jurisdiction over this action because it arises under federal statutory law. 28 U.S.C. § 1331.

2.      As a plaintiff seeking to enforce benefits under an ERISA plan, Migliorisi has the burden of proving, by a preponderance of the evidence, that he is entitled to benefits under the Policy. (Pl.'s Resp. to PFF ¶ 2.) *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 663 (7th Cir. 2005).

3.      The parties agree that, because the plan did not give discretion to the plan administrator to determine eligibility for benefits or construe the terms of the plan, this court's review is *de novo.* (Pl.'s Resp. to PFF ¶ 2.) *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 989 (7th Cir. 2005).

4.      In assessing whether Migliorisi is entitled to benefits, the court is not limited to the evidence presented to the administrator; rather, under a *de novo* standard of review, the court may consider any relevant evidence in determining whether Migliorisi is entitled to benefits. *Casey v. Uddeholm Corp.*, 32 F.3d 1094, 1099 n.4 (7th Cir. 1994). Migliorisi cites several Seventh Circuit cases, which he contends limit the court's consideration to the record before Paul Revere (Pl.'s Resp. to PFF ¶ 56), but these cases were decided under the "arbitrary and capricious" standard of review applicable to discretionary plan decisions, not the *de novo* standard applicable here; thus, they do not control. *See Reich v. Ladish Co.*, 306 F.3d 519, 524 (7th Cir. 2002); *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 688 (7th Cir. 1992).

5.      In conducting this review, issues of fiduciary duty play little to no role, because an insurer providing coverage to an ERISA beneficiary is not a fiduciary for that beneficiary when making decisions regarding his entitlement to benefits. *Wallace v. Reliance Standard Life Ins. Co.*, 318 F.3d 723, 724 (7th Cir. 2003). Thus, the court's review is directed to assessing whether

19

Migliorisi was entitled to benefits as of February 2001, not to examining the procedures or decisionmaking engaged in by Paul Revere.

6.     The court is entitled to consider the surveillance footage taken by Paul Revere of Migliorisi; such evidence can be probative of the credibility of claims by a plaintiff or his treating physician regarding his limitations, even if it cannot, by itself, determine a claimant's ability to work. *See Shyman v. Unum Life Ins. Co.*, 427 F.3d 452, 456 (7th Cir. 2005.)

## II.     Applicability of ERISA

7.     The Plan constituted an "employee welfare benefit plan" as defined by 29 U.S.C. § 1002(1).  (Ans. ¶ 7.)

8.     Migliorisi was covered under the Plan as a "participant" within the meaning of 29 U.S.C. § 1002(7).  (Ans. ¶ 7.)

9.     Migliorisi has exhausted all avenues of internal review under 29 U.S.C. § 1133. Accordingly, the denial of long-term benefits to Migliorisi is ripe for judicial review pursuant to ERISA section 502(a)(1)(B).  (Ans. ¶ 14.)

## III.     "Any Occupation" Disability

10.     In order to prevail, Migliorisi must demonstrate that, as of February 19, 2001, he satisfied the Policy's "any occupation" definition of disability.  (Policy at 8, 13; Pl.'s Resp. to PFF ¶ 2.)

11.     To show that he is entitled to benefits under the "any occupation" definition, Migliorisi must be "completely prevented[] from engaging in any occupation for which he is or may become suited by education, training or experience" because of injury or sickness.  (Policy at 8.)

12.     Migliorisi has failed to establish that his medical conditions as of February 19, 2001 prevented him from obtaining employment.  His account of the severity of his disability is rebutted by evidence in the record, including medical findings and his own reports to his doctors.  Moreover, he has not rebutted the evidence submitted by Paul Revere that he could work as a utilization

review coordinator, a cytotechnologist, a hospital admitting clerk, or a claims adjudicator.  (Pl.'s Resp. to PFF ¶ 66.)

13.    Thus, the court concludes that Migliorisi has failed to show, by a preponderance of the evidence, that he was entitled to disability benefits from Paul Revere under the Policy.

## **CONCLUSION**

For the foregoing reasons, the Plan's motion for judgment pursuant to Rule 52(a) [34] is granted.

ENTER:

Dated:  March 31, 2008

_____
REBECCA R. PALLMEYER
United States District Judge